UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

NICHOLAS CRISCUOLO,
individually;                                     )
                                                  )    NO. **CV-10-470-LRS**
          Plaintiff,                              )
                                                  )    **ORDER RE SUMMARY**
                                                  )    **JUDGMENT MOTIONS**
     v.                                           )
                                                  )
GRANT COUNTY, a Washington                        )
municipal corporation, et al.,                    )
                                                  )
          Defendants.                             )
_____ )

**BEFORE THE COURT** are the Defendant Grant County's Motion For
Summary Judgment (ECF No. 37), Defendant Beau Lamens' Motion For
Summary Judgment (ECF No. 41), Plaintiff's Motion For Partial Summary
Judgment On Affirmative Defense, RCW 4.24.410 (ECF No. 48), and Plaintiff's
Motion For Partial Summary Judgment On Affirmative Defense, RCW 16.08.030
(ECF No. 53).  The Defendant's motions were orally argued on March 29, 2012.
Adam P. Karp, Esq., argued for Plaintiff.  Jerry J. Moberg, Esq., and Patrick R.
Moberg, Esq., argued for Defendants.

**I. BACKGROUND**

On January 24, 2010, Grant County Deputy Sheriff Beau Lamens shot and
killed Slyder, a dog belonging to the Plaintiff, Nicholas Criscuolo.  The shooting
occurred at Neppel Landing Park in Moses Lake, Washington.  This park is

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-          1**

located within Moses Lake city limits and is open to the public.  Lamens was present in the park with his police dog, Maddox.   Lamens was assisting in the arrest of an individual (Jason Kier) for possession of methamphetamine and brought along Maddox, a drug detection dog.  Maddox weighs approximately 60 pounds.

Slyder was in the park with his owner, Criscuolo.  Slyder weighed approximately 110 pounds.  The City of Moses Lake has a law prohibiting dogs from "running at large" which is defined as "off the premises of the dog's owner and not under control by means of a leash."   City of Moses Lake Municipal Code, Animal Control, §§ 6.05.020(O) & 6.05.070.  Slyder was not on a leash when he made contact with Maddox who, at the time, was on a leash held by Lamens.  There was an altercation between the dogs and Lamens kicked Slyder in an effort to separate Slyder from Maddox[1].  During this altercation, Maddox slipped out of his collar and escaped from his leash.  After kicking Slyder, Lamens shot Slyder.

Plaintiff's Second Amended Complaint alleges claims under 42 U.S.C. §1983, as well as pendent state law claims.  Plaintiff alleges that by shooting and killing Slyder, Lamens unconstitutionally seized Slyder in violation of the Fourth Amendment.  Plaintiff alleges Grant County is liable in its own right for this constitutional violation because of a policy and/or custom and/or defective training.  Plaintiff alleges pendent state law claims for malicious injury to a pet, negligence (relative to killing Slyder), negligence (relative to physical invasion of Plaintiff), assault (as to Plaintiff), ordinary and/or willful conversion and/or

---

[1] As noted below, Lamens testified he kicked Slyder three times.  Other witness accounts vary as to the number of kicks but all witnesses acknowledge that Lamens kicked the plaintiff's dog while trying to separate him from the police canine.

**ORDER RE SUMMARY JUDGMENT MOTIONS-        2**

trespass to chattels, gross negligence, willful misconduct, and/or reckless property damage/destruction.[2]

## II. DISCUSSION

### A. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975). Under Fed. R. Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the non-movant.

---

[2] Certain pendent state law claims were previously dismissed by stipulation between the parties. (ECF No. 36).

**ORDER RE SUMMARY JUDGMENT MOTIONS-** **3**

*Matsushita*, 475 U.S. at 587. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-23.

### B.  42 U.S.C. §1983 Fourth Amendment Claim Against Lamens

The destruction of property, including the killing of a dog, qualifies as a seizure under the Fourth Amendment. *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005). To succeed on a Fourth Amendment claim for unlawful seizure, a plaintiff must show not only that a seizure occurred, but that the seizure was unreasonable. *Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378 (1989). A court must consider the totality of the circumstances and balance "the nature of the quality and quantity of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" to determine whether the force used to effect a particular seizure was reasonably necessary. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments- in circumstances that are tense, uncertain, and rapidly evolving- about the amount of force that is necessary in a particular situation." *Id*. at 396-97. Fourth Amendment claims are reviewed for objective reasonableness because the subjective intent of the defendant is irrelevant. *Brower*, 489 U.S. at 599.

The primary governmental interest to be considered based on the shooting of a dog is the safety of the officer. *San Jose*, 402 F.3d at 977. In the case at bar, Deputy Lamens appears to assert his interest was not his own safety, but the safety of his police dog, Maddox. Where danger is unexpected and imminent, or dogs are allowed to run free, unleashed, uncontrolled and unsupervised, the balance tips

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-        4**

1    in favor of the governmental interest. *Id*. On the other hand, "the private Fourth

2    Amendment possessory interests are obviously stronger when, although the dog is

3    unleashed, the owner is nearby and attempting to assert control over the dog."

4    *Altman v. City of High Point*, 330 F.3d 194, 207 (4th Cir. 2003).

5         At his deposition, Lamens testified that Slyder "jetted" past Plaintiff and did

6    not respond to any of Plaintiff's calls. He testified that between one and two

7    seconds elapsed between the time he saw Slyder run past the Plaintiff and when

8    Slyder made contact with Maddox. According to Lamens, Slyder never showed

9    aggression to him personally, but was focused on Maddox. Lamens testified that

10   Slyder did not bark at him at anytime, but emitted a low growl at Maddox and "his

11   face was down on Maddox." Lamens says he kicked Slyder three times.

12   According to Lamens: "Slider (sic) was trying to kill Maddox" and "his attack

13   didn't stop until I had to shoot him." Lamens acknowledges that at the time he

14   discharged his firearm, Slyder was not making contact with Maddox. Lamens was

15   asked how Slyder's body was positioned relative to his firearm and he testified:

16   "[K]ind of like I would have probably been looking at I think probably his right

17   shoulder. He was partially looking at me and partially looking at Maddox." (Ex. I

18   to ECF No. 46 at pp. 89-94).

19        Lamens' January 24 written report about the incident is consistent with what

20   he testified to during his deposition. (Ex. I to ECF No. 46 at pp. 105-06). Lamens

21   states in the report that after he shot Slyder, he called for Maddox who then

22   jumped into the rear of Lamens' patrol car. After that:

> [Lamens] quickly examined Maddox for injuries and observed an area of fur around Maddox's throat that was damp from the attacking dog's saliva. I also observed a similar area on Maddox's back.
>
> I made an emergency appointment with the Pioneer Veterinary Clinic in Moses Lake. Maddox was examined and it was discovered that he sustained a scratch on the

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        5**

inside of his right leg.  Maddox was released with no further injuries.[3]

Lamens' February 11, 2010 interview by the Chelan County Sheriff's Office is also consistent with his deposition testimony.  In that interview, Lamens says Plaintiff "yelled" at him and "I don't know if it, on his first yell or his second yell or whatever . . . he eventually ended up getting my attention and told me had . . . dogs off a leash . . . and raised up two . . . leashes . . . . and he said he was gonna leash his dogs."   According to Lamens, he told Plaintiff he needed to leash his dogs.  (Ex. 2 to ECF No. 68 at pp. 106-07).  Lamens added that:

> It seemed like he heard me when I said he needed to leash his dogs.  He went over and, I mean by his actions, he grabbed one, and ah, and then that, at that time I was like okay, we've got dogs off, off their leashes in the area. Um, so I start, start watching the area and then I see, I see him grab one dog and then I see the other dog kinda notice what's going on, and just makes a beeline for Maddox . . . .

(*Id*. at p. 107).[4]  Lamens was not aware of the location of Maddox at the time he shot Slyder.  (*Id*. at 111).

Two other Grant County deputies were present on the day of the incident and their versions of what occurred are generally consistent with Lamens' version. Deputy Brandon J. Bernard wrote in his January 27, 2010 report:

> I heard what I thought to be two dog[s] fighting.  By this I mean I heard dogs snarling.  I turned around to find a larger black dog attacking Maddox.  I observed the black dog bitting (sic) Maddox in the throat area.  As I ran to . . . Deputy Lamens' and the dog's [assistance], I observed Deputy Lamens kick the black dog twice.  I observed the dog to be so focused on Maddox it continued to attack after being kicked twice.
>
> As I made it to Deputy Lamens, the black dog turned broad side to him.  Deputy Lamens drew his service weapon push

---

[3]  The lack of serious injury does not necessarily mean Slyder was not attempting to injure Maddox.

[4]  See also Lamens Dep., Ex. 2 to ECF No. 68 at pp. 46-48.

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-        6**

out as if he was going to fire his weapon and then pulled back.
The dogs were circling each other and it appeared Deputy
Lamens did not have a clear shot at that time.  At the first
safe opportunity Deputy Lamens had to stop the attack, he
pointed in and fired three rounds at the black dog.

(Ex. D to ECF No. 46 at pp. 32-33).

In his January 26, 2010 report, Deputy Kevin Dobson wrote:

Although I could not see exactly what was going on[,] I
sensed definite immediacy in Deputy Lamens['] voice.
He requested assistance in a stern manner and it seemed
his attention was divided between us and something else.
I quickly went over to Deputy Lamens.  While moving over
there[,] I noticed Deputy Lamens was moving back and forth,
rotating his position, and moving laterally.  When I cleared the
barricade[,] I noticed there was a large black in color dog
attacking Maddox.  The dog appeared to be possibly a Shepard/
Rottweiler crossbreed dog.  The dog was rather large and I
estimated its weight at over one hundred pounds.

I witnessed the attacking dog bite Maddox several times in the
area of the neck.  I saw the attacking dog specifically bite Maddox
in the throat area where there are several vital areas for survival.
I also witnessed the attacking dog attempt to gain control of
Maddox by bitting (sic) behind the neck in the spinal area.

Due to the areas the attacking dog was bitting (sic) and the reaction
from Maddox[,] I believed Maddox was in danger of being seriously
injured or killed.  At this point[,] I decided to dispatch the attacking
dog and un-holstered [my] department authorized semi-automatic
handgun.  I was unable to gain a clear sight picture of the attacking
dog due to both dogs being intertwined.

During the entire time[,] Deputy Lamens was attempting to pull
Maddox away from the attacking dog.  At one point[,] I noticed
Maddox's collar was pulled off and Deputy Lamens was trying to
keep himself between Maddox and the attacking dog.  I attempted
to move myself to the right side of Deputy Lamens to gain a
clear sight picture and dispatch the attacking dog.  As I was
moving to the right side of Deputy Lamens[,] I saw him
un-holster his department authorized semi-automatic handgun
and shoot three shots at the attacking dog.  Although I was
partially blocked by Deputy Lamens[,] it appeared he had a
clear sight picture as the two dogs had briefly separated.  It
appeared all three shots struck the attacking dog.  The dog
stumbled a short distance and collapsed.

(Ex. E to ECF No. 46).

**ORDER RE SUMMARY
JUDGMENT MOTIONS-          7**

On or after the day of the incident (January 24, 2010), the Plaintiff handwrote a statement recounting what happened and then had the statement typed up by someone else. Plaintiff signed the typed statement. (Ex. C to ECF No. 46 at pp. 113-14). According to that statement: "While the dogs [Slyder and Maddox] were **fighting**, I was about fifteen feet away and moving ever closer towards them. The **fight** itself lasted about ten seconds before the officer started to kick Slider (sic)." (Emphasis added). Plaintiff added that: "After the final time Slider (sic) was kicked by the officer, Slider (sic) started heading down the hill. He passed by me no more than two paces, and then was coming towards me." (*Id*. at p. 122).

Plaintiff was interviewed on February 3, 2010, regarding the incident, by a Chelan County Sheriff's Office detective. According to Plaintiff:

> The police officer's dog bit Slider (sic). Slider (sic) . . . tried to protect himself from harm . . . and impose his dominance on the police dog . . . in dog fashion . . . . however, the police officer was kicking and . . . as long as I have been talking . . . this event has happened even quicker than I described it. The last kick . . . the officer gave Slider (sic) to his . . . butt, Slider (sic) kinda slid down this little hill right by me, not more than two paces . . . probably less. . . . As he slid by me, he started to turn towards me, I saw out of the corner of my eye, one officer step up, no more than four inches to my right hand shoulder and then saw the other officer step up beside him, draw his weapon . . . and shoot my dog.

(Ex. G to ECF No. 46 at pp. 41-42).

Plaintiff added that the "dog **fight**" lasted "three to five seconds" and that he would have been willing to wade into the fight, "[b]ut I didn't have the chance, it was over that quick." (*Id*. at p. 44)(emphasis added). Plaintiff recalls hearing some "growling" when Slyder interacted with Maddox. (*Id*. at p. 58).

In his subsequent deposition (December 19, 2011), Plaintiff asserted the dogs were not fighting and it was "more like pushing and shoving in a schoolyard of two young boys or two young men." (Ex. J to ECF No. 46 at p. 112). Plaintiff testified the dogs "were interacting . . . in an aggressive manner, I wouldn't call it

**ORDER RE SUMMARY JUDGMENT MOTIONS-    8**

fighting." (*Id*. at 115).   Plaintiff testified that "ten paces" was probably the longest distance between anybody during "the interaction between Slider (sic) and Maddox." (*Id*. at 119).  Plaintiff says it "appeared" Slyder was turning around towards him at the time Slyder was shot, but did not "get a chance to turn all the way around." (*Id*. at 118 and 121).  Plaintiff acknowledges he did not know where Maddox was at the time Slyder was shot.  " (*Id*. at 121).

Plaintiff executed a declaration in February 2012 (Ex. E to ECF No. 68) in which he states, among other things: 1) when Slyder got past him to go to Maddox, the Plaintiff was between 10 and 15 feet, and not more than 20 feet, from Lamens and Maddox; 2) "Maddox attacked Slyder, biting him in the face.  Slyder responded by defending himself but did not injure Maddox.  The dogs were not 'fighting' in the sense that either dog was about to injure, mildly or seriously, the other;" 3) Plaintiff was about ten to twelve feet from Slyder when Lamens was kicking Slyder; 4) Lamens' final kick sent Slyder down the hill facing toward the Plaintiff and Slyder ran past the Plaintiff a few steps under his own power and "then began to turn toward me, at which point Dep. Lamens drew his pistol and fired three times;" 5) Plaintiff was one to two feet from Slyder and reaching for his collar when Lamens fired the shots.

Besides Lamens and the Plaintiff, there were some other people in the vicinity during the incident, although they witnessed the events from a greater distance than Plaintiff, and most certainly, from a greater distance than Lamens. At his deposition, Reynaldo Pichardo says the dogs fought for about 15 seconds; that Lamens kicked Slyder two or three times and Slyder ran off about ten feet before turning to face Lamens; that Maddox was next to Lamens when the shots were fired, and when the shots were fired, Maddox jumped into the back of the patrol car.  (Ex. K to ECF No. 46 at pp. 125-28).  In a declaration which he executed prior to his deposition (Ex. D to ECF No. 68), Pichardo stated:

**ORDER RE SUMMARY JUDGMENT MOTIONS-**          **9**

> I saw Dep. Lamens draw his firearm (even while he was kicking at Slyder) and fire several times at Slyder after Slyder had run off, stopped and turned sideways, pacing toward [Plaintiff].  When shot, Slyder was not moving, not coming back toward Dep. Lamens or Maddox, and not growling or baring his teeth or barking.  He was shot while standing perpendicular (i.e., not facing) to Dep. Lamens, more than 8-to-10 feet away, downhill, making a perfect target for shooting.

At his deposition, Mike Workman testified that Slyder approached Maddox at "a trot" and that the dogs were "engaged" for about ten seconds.  (Ex. L to ECF No. 46 at pp. 23 and 41)  Asked whether it appeared Slyder was about to return to make another run at Maddox just prior to being shot, Workman responded:

> It didn't appear so.  But, you know, he was sideways, meaning he was not fully retreating either.  I believe . . . if a dog or animal is fully retreating[,] he's running away.  And so he was standing sideways.

(*Id*. at p. 42).  Workman testified he did not believe Slyder was moving when he was shot and that the estimated distance between Lamens and Slyder at that time was probably ten feet.  (*Id*.).

At the time of the incident, Jason Kier was sitting in the back of a patrol car, having just been arrested.  According to Kier in his deposition, Slyder charged up the hill and attacked Maddox; Lamens tried to fend off Slyder by kicking him and at the same time, Lamens was holding back Maddox by his leash when the leash seemed to break; that the "scuffle" took about ten seconds before Lamens took a couple of steps back and discharged his firearm.  Kier maintains Slyder was not shot as he was running away, but was in "full on aggressive mode."  (Ex. M to ECF No. 46 at pp. 144-46).  Kier says Slyder and Maddox were still both in the same vicinity at the time Lamens shot Slyder.  (*Id*. at p. 150).

Glenda Moore was working at Danny's Tavern located adjacent to Neppel Park on the day of the incident.  She took a short break around the lunch hour and joined Mike Workman, Linda Workman, Reynaldo Pichardo and others who had congregated in the back alley adjacent to the park to witness the police activity

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        10**

taking place.  She says Slyder came up the hill and there "ensued a little snarling match, and some tangling, but it was not violent and no injuries were inflicted that I observed."  She says "[t]he dogs were tangling for at most a few seconds."  She says Lamens kicked Slyder twice and after the second kick, "Slyder began running down the hill about 10-20' toward [Plaintiff]."  She says she then saw Lamens "unhook Maddox" who ran back to Lamens' patrol car.  According to Moore, Lamens then un-holstered his gun.  She asserts that "while Slyder was retreating down the hill, there was adequate time for Dep. Lamens to get Maddox back in the car," but instead, "Lamens took a shooting position and fired at Slyder at least twice."  Moore maintains that Plaintiff was only a foot away from his dog at the time Slyder was shot and that Plaintiff had a leash in his hand when he was reaching for Slyder.  (Ex. D to ECF No. 51).

In her declaration, Linda Workman states: 1) Slyder did not run towards Maddox, but was "moving at a trot" and "was not aggressively approaching Maddox;" 2) Slyder and Maddox "both barked and growled and touched bodies, but they were not in a dog fight;" rather, it was "a small quarrel" that "lasted but a matter of seconds;" 3) Lamens kicked Slyder and this caused the two dogs to separate briefly after which Slyder moved toward Plaintiff who was clambering up the hill and calling for Slyder to come to him; 5) Slyder was "retreating" to Plaintiff; 6) although Lamens' kick was "forceful," it only moved Slyder a very short distance down the hill, perhaps two feet, and Slyder continued at least another 8 to 10 feet under his own power before being shot; 7) at the time he fired his weapon, Lamens dropped the leash to Maddox; and 8) when shot, Slyder's rear end was facing toward Lamens "meaning Dep. Lamens would see his broad side as Slyder was running away."  (Ex. E to ECF No. 51).

Obviously, there are different versions of what exactly occurred, and perhaps that is not surprising considering the rapidity with which the events

**ORDER RE SUMMARY JUDGMENT MOTIONS-    11**

unfolded.  Importantly, however, it was Deputy Lamens who was in the middle of the fray and there is general agreement on certain key points: 1) Slyder was unleashed, uncontrolled, and the two dogs were fighting to one degree or another; 2) everything happened very quickly, within a matter of seconds, requiring Lamens to make a split-second decision about what action he was going to take; 3) when Lamens decided to shoot, Maddox was off his leash and Lamens was not sure of Maddox's whereabouts; of course, Slyder also remained off-leash at that point and so Lamens could not discount the possibility that Slyder would go after Maddox again[5]; 4) Lamens was not familiar with Slyder and did not know his propensities; the behavior of dogs is inherently unpredictable.

Plaintiff contends there are genuine issues of material fact as to whether Lamens acted in a reasonable manner, relying on testimony from the non-law enforcement witnesses, including Plaintiff, and from an expert, James Crosby (Ex. K to ECF No. 68).  This testimony, however, amounts to no more than speculation about what Lamens might have done differently if he had time to think about things and the benefit of 20/20 hindsight.   For example, Plaintiff suggests Lamens could have used his Taser or pepper spray, but "[r]equiring the least intrusive alternative is not a realistic approach where law enforcement officers have to make split second decisions regarding their safety," *McCarthy v. Kootenai County*, 2009 WL 3823106 at *6, or as in this case, the canine dog's safety.[6]

Plaintiff seemingly contends there is evidence that Lamens knew Plaintiff's dogs (Slyder and Dymond) were unleashed and had adequate time to put Maddox

---

[5] As noted, Mike Workman stated he was unsure if Slyder was "retreating."

[6] It also must be considered whether Lamens would have had sufficient time and an opportunity to effectively use a Taser or pepper spray on an off-leash Slyder before Slyder sought to re-engage with an off-leash Maddox.

**ORDER RE SUMMARY JUDGMENT MOTIONS-      12**

back in the patrol car.  First, of all, it was Plaintiff who had a legal obligation to keep his dogs leashed in a public park and Lamens had every reason to expect other dogs in the park would be leashed.[7]  In any event, the evidence indicates Lamens and Maddox were taken by surprise when Slyder came up the hill and "interacted" with Maddox.  In his February 3, 2010 interview, Plaintiff says that when he first arrived at the park on the day of the incident, he asked one of the deputies (Dobson) in the parking lot whether  it would be okay for him to run his dogs down at the lake and the deputy responded  "why should I care?"  (Ex. G to ECF No. 46 at p. 41).  Plaintiff, however, was not entitled to assume the officer was consenting to Plaintiff running his dogs without a leash.   Furthermore, Lamens was not part of this conversation[8] and the conversation is denied by the Defendants.

_____

[7] Plaintiff contends Lamens should have "scanned the area to see if dogs were present at the open public park where common sense dictated people would actually use it and bring dogs there and, in fact, dogs frequented the park 24/7." Lamens, however, was entitled to reasonably believe people would have their dogs leashed up as required by city ordinance.

[8] Prior to the interaction between Slyder and Maddox, Deputy Bernard saw the Plaintiff and his dogs (Slyder and Dymond) down by the lake's edge, but he was not "looking for dogs on a leash" and did not see from a distance whether the dogs were on a leash.  (Bernard Dep., Ex. A to ECF No.  68 at p. 14).  There is no merit to Plaintiff's assertion that "Deputy Bernard saw Mr. Criscuolo and his unleashed dogs minutes before Defendant Lamens ever arrived, yet failed to secure the scene from loose dogs before Maddox was let out of the vehicle." Regardless, Lamens was the one who was taken by surprise and is the individual whose "reasonableness" is  assessed.

**ORDER RE SUMMARY JUDGMENT MOTIONS-        13**

In his February 3, 2010 interview, Plaintiff says when he first got his dogs out of his vehicle, they were on leashes, but then he decided to take the leashes off so the dogs could "stretch their legs out, chase some ducks or whatever" by the lake's edge.  He says that at some point he looked back up the hill where he had parked, and where the officers had parked, and noticed that one officer had brought out a canine dog.  (Ex. G to ECF No. 46 at p. 41).  Then, according to Plaintiff:

> I yelled up first, my dogs are gonna come up there because they're gonna wanna investigate and introduce themselves. **Apparently my voice wasn't heard . . . cuz the officer put his hand up to his ear . . . telling me that he couldn't hear me.  The second time as I'm moving faster down the railroad tracks trying to get in between my dogs and . . . the officer . . . I said again . . . could you put your dog in the car? And I didn't hear any response or even see any response because I had turned my head by this time and . . . notice that my female dog [Dymond] was running up the hill to me.  I put her chain on.  My male dog [Slyder], he went running on by, I missed him by maybe one or two steps.  He went up to Maddox . . .**

(*Id*.).  (Emphasis added).

Plaintiff's statement confirms that everything happened very quickly and that Slyder's off-leash presence took Lamens and Maddox by surprise, giving Lamens insufficient time to get Maddox back into the patrol car.

There are allegations that Maddox was not well-trained and bit Slyder first.  Even if true, this is irrelevant.  What is relevant is that a dog fight ensued and Lamens was concerned about the welfare of his police dog.   Slyder may have been "well-mannered, well-known in the community, and nonreactive even to those in uniform," as asserted by Plaintiff, but Lamens was not familiar with

///
///
///
///

**ORDER RE SUMMARY JUDGMENT MOTIONS-        14**

Slyder, dogs are inherently unpredictable in their behavior,[9] and Lamens was not concerned with his personal safety, but the safety of Maddox.[10]  A dog may interact well with humans, but not with other dogs.  Thus, it is unreasonable for Plaintiff to suggest Lamens could have asked Bernard and/or Dobson to pull Slyder away "while Lamens took Maddox back to the vehicle . . . and nothing physically prevented Lamens from commanding Maddox to return to the vehicle while he grabbed Slyder and held him back."  Plaintiff asserts "Lamens lost physical control of Maddox, failing to link the running ring on the collapsible collar, and failing to issue any voice commands . . . ."  Even if Lamens failed to do something which allowed Maddox to slip free from his leash, that too is irrelevant.  What is relevant is that Maddox did slip free during the interaction with Slyder and under those circumstances, Lamens was legitimately concerned about the safety of Maddox.  And again, everything took place within a matter of seconds.

Plaintiff maintains that at the time Slyder was shot, he (the Plaintiff) was nearby and attempting to assert control over the dog.  As noted, "[p]rivate Fourth Amendment possessory interests are obviously stronger when, although the dog is unleashed, the owner is nearby and attempting to assert control over the dog."  *Altman*, 330 F.3d at 207.  Even assuming Plaintiff was nearby and attempting to assert control over Slyder when Slyder was shot, considering how quickly everything happened; that Slyder was not under control and it is debatable whether

---

[9] "All dogs . . . contain a latent threat to human safety . . . and can be unpredictable both in their actions and in the signals they send."  *Powell v. Johnson*, 2012 WL 124927 at *4 (D. Minn. 2012).

[10] The safety of a police dog constitutes a governmental interest as confirmed by the fact that Washington has criminalized the harming of police dogs.  RCW 9A.76.200.

**ORDER RE SUMMARY JUDGMENT MOTIONS-     15**

1  he intended to respond to Plaintiff's commands when he had not responded to

2  them previously when running past the Plaintiff to Maddox; and that Maddox also

3  was not under control and loose, the court must conclude the governmental

4  interest (protecting Maddox) constitutes the prevailing interest in this case.

5  "Where danger is unexpected and imminent, or dogs are allowed to run free,

6  unleashed, uncontrolled, and unsupervised, the balance tips in favor of the

7  governmental interest." *Birkes v. Tillamook County*, 2011 WL 1792135 at *5 (D.

8  Or. 2011). "[D]og owners forfeit many . . . possessory interests when they allow

9  their dogs to run at large, unleashed, uncontrolled, and unsupervised, for at that

10  point the dog ceases to become simply a personal effect and takes on the nature of

11  a public nuisance." *Altman*, 330 F.3d at 194.

12    Considering the totality of the circumstances in this particular case, the

13  court finds as a matter of law that Deputy Lamens acted in an objectively

14  reasonable manner and therefore, the killing of Slyder was not an unreasonable

15  seizure under the Fourth Amendment.  Lamens was confronted with a tense,

16  uncertain and rapidly evolving situation.  This situation was created by the fact

17  Slyder was unleashed and uncontrolled.  This situation was not of Lamens' own

18  making to any extent.  Faced with an unexpected and imminent danger and only

19  seconds to react, Lamens responded in an objectively reasonable manner.[11]  The

20  fact he fired three shots in rapid succession from his semi-automatic service

21  ///

22  ///

23  ///

24  ///

25

26    [11]  That the danger was imminent here is corroborated by Deputy Dobson's

27  testimony that he had also un-holstered his firearm.

28

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-**      **16**

weapon does not in any way diminish the "reasonableness" of the seizure.[12]

### 1. Qualified Immunity

The lack of a constitutional violation makes it unnecessary to consider whether Deputy Lamens is entitled to qualified immunity. If, however, there was a constitutional violation, Deputy Lamens would be entitled to such immunity from damages.

"The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534 (1991), quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986). The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake

---

[12] "Reasonableness" in the 42 U.S.C. §1983 context is not measured by a negligence standard. Lack of due care, or negligence, is insufficient. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662 (1986). There must be a deliberate or affirmative act or omission of the defendant which causes the deprivation of constitutional rights. *Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir. 1989).

**ORDER RE SUMMARY
JUDGMENT MOTIONS-        17**

based on mixed questions of law and fact." *Id*., quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004).

In *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001), the Supreme Court mandated a two-step sequence for resolving qualified immunity claims. First, the court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. Even assuming the existence of a constitutional violation, an officer is entitled to qualified immunity if the constitutional right was not clearly established at the time of the alleged violation. The Supreme Court's recent decision in *Pearson* modified the *Saucier* analytical framework so that the decisional sequence required by *Saucier* is no longer mandatory. A court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818. When determining whether a constitutional right was clearly established, a court must look to the "specific context of the case," and not just "broad general propositions." *Saucier*, 533 U.S. at 201.

The qualified immunity "objective reasonableness" defense applies even to Fourth Amendment challenges where the constitutional standard itself is objective reasonableness. There are two standards of reasonableness such that conduct which is unreasonable under the Fourth Amendment can still be considered objectively reasonable for the purpose of qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S.Ct. 1092 (1986). For example, a police officer may "reasonably, but mistakenly, conclude that probable cause is present." *Anderson*, 483 U.S. at 640. If the law is not sufficiently clear that a reasonable official would understand that what he did violated a constitutional right, he is entitled to

**ORDER RE SUMMARY JUDGMENT MOTIONS-    18**

qualified immunity from damages.  Conversely, if the law is sufficiently clear that he would understand that what he did violated a constitutional right, he is not entitled to qualified immunity.

Lamens did not act in a plainly incompetent fashion, nor did he knowingly violate the law.  There was no "clearly established law" which would have put a reasonable officer on notice that, under the particular circumstances, killing Slyder amounted to a violation of the Fourth Amendment.  Considering the rapidity with which the events occurred, Lamens was forced to make a split-second decision as to how he was going to protect his police dog.  If Lamens was mistaken as a matter of fact as to the threat posed by Slyder, and/or if he was mistaken as a matter of law as to what action was appropriate to take under the circumstances, these mistakes were reasonable.  Put another way, he reasonably, but mistakenly, concluded Slyder presented an imminent danger to Maddox and/or he reasonably, but mistakenly, concluded shooting Slyder was an appropriate manner of dealing with the danger.

### C.  42 U.S.C. §1983- Fourth Amendment Claim Against Grant County

Because Deputy Lamens did not unreasonably "seize" Slyder in violation of the Fourth Amendment, there is no constitutional violation for which Grant County can be held liable.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571 (1986).

Even if the court were to conclude a genuine issue of material fact exists with regard to whether Lamens "seized" Slyder in violation of the Fourth Amendment, there are no genuine issues of material fact precluding ruling as a matter of law that a Grant County policy, custom or practice, or a lack of adequate

**ORDER RE SUMMARY
JUDGMENT MOTIONS-          19**

training by the County, was not the cause of any constitutional violation.[13]

Grant County Sheriff's Office has a policy, GCSO Section 7.14, which provides in relevant part:  "Animals . . . who are vicious and/or attacking persons or property may be killed at the discretion of the deputy."  Plaintiff asserts Grant County has "a consistent and deliberate policy to treat dogs and humans like 'apples and oranges,' allowing a laissez-faire, devil-may-care, unbridled discretion to rule when animals are the deputies' targets, but to impose a detailed and comprehensive force rubric when humans are involved."  According to Plaintiff, "[t]he existence of a policy takes the form not only positively through 7.14, but negatively in terms of the safeguards inherent in Sections 7 and 8" and "[w]hether construed *in pari materia* as a policy within a policy, or as a policy not to have a policy, Mr. Criscuolo has met his burden."

First, it is reasonable for the County to treat dogs and humans differently.  It is reasonable for the other sections of GCSO's "Firearms" policy contained in Section 7, and its "Use Of Force" policy, contained in Section 8, to apply only to humans.  The County's failure to extend the protections of those other sections to dogs, in effect a lack of policy, cannot give rise to liability on the part of the County.  Secondly, Section 7.14 does not provide a deputy with "unbridled discretion" to kill an animal.  The animal must be "vicious and/or attacking persons or property."  Section 7.14 does not permit a deputy to kill an animal without reasonable justification.  If Deputy Lamens killed Slyder without reasonable justification, Section 7.14 was not the "moving force" behind the

---

[13] Where an individual officer is entitled to qualified immunity even though a constitutional violation occurred, the officer's immunity will not protect a municipality from liability under §1983.  *Burke v. County of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009).

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-        20**

1   constitutional violation.  *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th

2   Cir. 2006)("To impose liability against a county for its failure to act, a plaintiff

3   must show: (1) that a county employee violated the plaintiff's constitutional rights;

4   (2) that the county has customs and policies that amount to deliberate indifference;

5   and (3) that these customs or policies were the moving force behind the

6   employee's violations of constitutional rights").

7       Plaintiff contends that "[w]ith deliberate indifference, the County offers no

8   interpretive guidance to its deputies in implementing 7.14, perceiving canine

9   threats, and neutralizing canine disturbances short of killing."  Plaintiff asserts

10  that this lack of training caused the alleged constitutional deprivation here "goes

11  without saying" where the County did not take "any steps to instruct its deputies

12  on what constitutes a 'vicious' or 'attacking' dog and when the deputy may

13  prudently elect not just to kill . . . ."  The court disagrees.  Whether an animal is

14  "vicious" or "attacking" is a common sense determination which does not require

15  any specialized training.[14]  This simply was not a situation where "the need for

16  more or different training is so obvious, and the inadequacy so likely to result in

17  the violation of constitutional rights, that the policymakers of [Grant County] can

18  reasonably be said to have been deliberately indifferent to the need."  *City of*

19  *Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197 (1989).

20      Finally, Plaintiff's contention that the fact Lamens was promoted to corporal

21  within a couple months of the incident amounts to Grant County ratifying alleged

22  unconstitutional conduct, constitutes no more than mere speculation.

23

24

25      [14]  Particularizing the criteria for ascertaining whether an animal is "vicious"

26  or "attacking" would hinder an officer's discretion in an unexpected, tense,

27  uncertain and rapidly evolving situation.

28

**ORDER RE SUMMARY**
**JUDGMENT MOTIONS-**       **21**

### D. Pendent State Law Claims (Lamens and Grant County)

Plaintiff has asserted a number of pendent state tort law claims against Lamens and Grant County.[15]

This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. Section 1367(a). It may decline to exercise supplemental jurisdiction over those claims if it has dismissed all claims over which it has original jurisdiction, those being the federal claims. 28 U.S.C. Section 1367(c)(3). In deciding whether to exercise supplemental jurisdiction over state law claims, district courts should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S.Ct. 523 (1997).

"Fairness and comity," in particular, dictate that the court decline to exercise supplemental jurisdiction. The Grant County Superior Court should decide the extent to which this court's ruling on the Fourth Amendment claims impacts Plaintiff's state tort law claims. In this regard, it is noted that some of those tort claims are concerned with alleged physical invasion and assault of the Plaintiff which occurred during the shooting of Slyder. There are potential novel questions of state law relating to the affirmative defenses asserted by Lamens and the County, and the damages sought by Plaintiff. These questions should be resolved by a state court. 28 U.S.C. Section 1367(c)(1).

## III. CONCLUSION

Defendant Beau Lamens' Motion For Summary Judgment (ECF No. 41),

---

[15] Grant County is subject to vicarious liability for any common law torts committed by Lamens within the scope of his employment. *LaPlant v. Snohomish County*, 162 Wn.App. 476, 271 P.3d 254, 256 (2011).

**ORDER RE SUMMARY JUDGMENT MOTIONS-    22**

1   and Defendant Grant County's  Motion For Summary Judgment (ECF No. 37), are

2   **GRANTED**, and Defendants are awarded judgment on Plaintiff's Fourth

3   Amendment claims asserted against them.

4          The court declines to exercise supplemental jurisdiction over Plaintiff's

5   pendent state law claims and those claims are **DISMISSED without prejudice** to

6   their reassertion in Grant County Superior Court.  Plaintiff's Motion For Partial

7   Summary Judgment On Affirmative Defense, RCW 4.24.410 (ECF No. 48), and

8   Plaintiff's Motion For Partial Summary Judgment On Affirmative Defense, RCW

9   16.08.030 (ECF No. 53),are moot and are **DISMISSED without prejudice**.

10         **IT IS SO ORDERED**.  The District Executive is directed to enter judgment

11  accordingly and forward copies of the judgment and this order to counsel of

12  record.  The file shall be closed.

13         **DATED** this___9th___of April, 2012.

14

15                                 *s/Lonny R. Suko*

16                          _____
                                    LONNY R. SUKO
                                 United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

**ORDER RE SUMMARY
JUDGMENT MOTIONS-          23**